W. C. MACFADDEN, Petitioner and Appellant, v. EVA M. JENKINS et al., Respondents.

(169 N. W. 151.)

Partnership — between two parties — dissolution — one continuing the business — death of partner continuing business — before liquidation of old firm affairs — estate of — administration of — corporation — forming of — by administrator, wife of deceased and one other — purpose of — to continue former business — subscription to stock — entry of in corporation books — good will — constitutes agreement to pay amount stated.

1. Where there existed a partnership between two parties which was dissolved by mutual consent, one of the partners continuing and succeeding to the business of the firm including the firm name, and the partner who continues the business before the liquidation of the partnership is completed dies, and one who was not theretofore connected with the partnership was appointed administrator of the estate of the deceased partner, and, after his appointment and qualification as administrator and his entry upon the discharge of his duties as such administrator, forms a corporation, the incorporators consisting of himself and two others, one being the wife of the deceased, for the purpose of continuing the business of the deceased, and the following entry is made on the corporate books: "Paid for good will of company fifteen shares of stock to E. M. Jenkins, fifteen shares to Macfadden, and fifteen shares to B. Simonitsch," each share being for $100, the total of such shares being $4,500,—it is *held* under all the testimony, circumstances, and facts of this case that the corporation took over the business of the deceased, and the notation made upon the books of the company with reference to the good will is an agreement to pay $4,500 for the good will of such business.

**Partnership — dissolved mutually — one of partners continuing the business — and name of firm — liquidation undertaken by — dies before completion — real and personal property — equitable title to — vests in the surviving partner in trust only — for liquidation purposes — heirs and representative of deceased — entitled to balance — after liabilities are paid.**

2. Where a partnership existed and was dissolved by mutual consent, and one of the partners continues the business and succeeds thereto, and the name of the partnership, and the continuing partner undertakes to liquidate the partnership and is doing so, but has not completed such liquidation at the time of his death, the equitable title to all property, both real and personal, vests in the surviving partner in trust, and in trust only, for the purpose of liquidation, and the heirs or representatives of the deceased are entitled to any balance remaining after the partnership liabilities have been satisfied.

**Estate of deceased partner — stranger to partnership business — appointed administrator — qualifies — assumes control — trust relation — corporation — forming of — administrator elected president of — property of deceased — sold to — through probate court proceedings — conflict between such relations — personal and individual interests.**

3. Where a partnership existed, which has been dissolved by mutual consent of the partners, and one of the partners continues the business and succeeds to the name and becomes the liquidating partner, and is engaged in the continuance of the business and liquidation of the partnership at the time of his death, and one, a stranger to the partnership, is appointed administrator of the estate of the deceased and duly qualifies and enters upon his duties, such administrator immediately upon his qualification assumes a trust in relation to all the property of the deceased, and all such property of the deceased in the hands of the administrator is impressed by a trust which the administrator is in law bound to faithfully execute; and where such administrator after his qualification organizes a corporation of which he is president, to which is sold the property of the deceased by the administrator through the probate court, and such corporation comes into possession and control of the property of such deceased and sells and disposes of the same,—it is *held* that under these facts and circumstances there is a direct conflict between the trust relations of such administrator of the estate of the deceased, and his self-interest represented by the corporation of which he was president. In such case it is apparent that it would be to the interest of the administrator as a part owner of the stock of the corporation to purchase the property from the estate as cheaply as it could be purchased, and as administrator under these circumstances it would be to his personal interest and individual gain to sell the land and property of the estate to the corporation at as low a price as he could.

**Administrator — selling estate property — to corporation of which he was president — taking possession of such property — amounts to purchase by administrator — profit or gain made — accrues to benefit of cestui que trust — administrator accountable for.**

4. Where, as in this case, the administrator of the estate of a deceased person sells and disposes of the trust property to a corporation of which he is the president, or of which he is a member, and permits such corporation to receive and take possession of the personal property and control and dispose of it, it is *held* that the purchase of the property by the corporation is in such case a purchase by the administrator, and that the value of such property, and any gain or profit made by the corporation, shall accrue not to the corporation, but to the *cestui que trust* or the legal representatives of the deceased, and the administrator is accountable for all the value of the property of the intestate which came into his hands and under his control, and is held accountable therefor.

**Trustee — violation of trust — conversion of trust property — by individual acts — or through other agencies — liability of.**

5. Where a trustee violates his trust relations, and wrongfully and fraudulently converts the trust property either directly himself or by and through other agencies, such as corporations or other agencies formed, of which the administrator is a member, the administrator is liable in equitable conversion for the value of all such property so converted, and the profits and gains thereof, if any.

**Corporation — legal entity — when used for legal purpose — wrongs — frauds — cannot be used to cover — courts — duty of.**

6. A corporation may be considered a legal entity when used for the accomplishment of a legal purpose. Corporations, however, cannot be used as a cover under which wrongs may be committed and fraud perpetrated. In such case the court will look through the form of the corporation to ascertain its actual purpose and intent. If the purpose and intent of the corporation are bad its corporate entity will be no cover for wrong, fraud, and bad faith.

**Administrators — estates — claims against — may not purchase at discount — and charge up full face of claims — may not make personal gain — in settlement of claims against estate.**

7. Administrators may not purchase claims against the estate at discount and in their accounting charge up such claims for the full amount of the face of such claims. The administrator may not thus make an individual profit for himself and for his own personal benefit, either in dealing with or settling the claims against the estate, or in dealing with any of the property of the estate of which he is administrator.

Administrator — equitable conversion — liability — trial court — may restate account of — county court — directions to — from district court — final account.

8. Where the administrator has been held liable as in this case, for equitable conversion, it was proper for the trial court to restate the account in the manner in which it did in this case, and to order the county court from which the appeal was taken to correct the final account of the administrator in accordance with the finding and judgment of the trial court, the district court having appellate jurisdiction to try and determine the correctness or incorrectness of an order allowing or disallowing the final account.

Opinion filed March 6, 1918. Petition for rehearing denied September 9, 1918.

Appeal from the judgment of the District Court of Cass County, Honorable *Chas. A. Pollock,* Judge.

Affirmed.

*Engerud, Divet, Holt & Frame,* and *Fowler & Greene,* for appellant.

One partner cannot sue his copartner on an overdraft of the nature here presented, until their mutual accounts are settled by liquidation of the partnership. Devore v. Woodruff, 1 N. D. 143; Gleason v. White, 34 Cal. 258; Parsons, Partn, 3d ed. p. 293; Painter v. Painter (Cal.) 9 Pac. 450.

"A partnership interest is one owned by several in partnership for partnership purposes."

"The ownership of property by several persons is either of joint interests, or partnership interests, or of interests in common." Comp. Laws 1913, §§ 5261, 5263; Civ. Code, art. 2, chap. 74, Comp. Laws 1913, §§ 6389 et seq.

On the death of a partner the surviving partner succeeds to all the partnership property, whether real or personal, in trust for the purposes of liquidation, even though the deceased was appointed by agreement sole liquidator; and the interest of the deceased in the ultimate distribution of the partnership assets passes to those who succeed to his other personal property. Comp. Laws 1913, § 6425.

These statutes form a departure from the American common law on the subject prevailing in most states, and are an adoption of the English rule, which embodies the rule recognized and applied in courts of equity. Woodward v. Nudd, 27 L.R.A. 340, and notes.

The surviving partner takes the title to partnership personalty for the purposes of liquidation and has the right to conduct such liquidation. If, in the process of liquidation, he finds it necessary to sell the lands to pay debts, or to recover his own claims on the partnership, he can resort to equity to compel the heirs to execute conveyance of the legal title. 27 L.R.A. p. 349, note, II. C.

A district legal estate is created termed a "partnership interest," which is neither a joint tenancy nor a tenancy in common. Comp. Laws, §§ 8711, 8717, 8768.

In such cases the administrator of the estate of a deceased partner acquires only the right to receive whatever balance, in money or other property, that may ultimately be found to be due to the decedent, when the partnership affairs are settled. Thompson v. Weeks, 26 Cal. 51; Theller v. Pioche, 57 Cal. 447; Andrade v. Court (Cal.) 17 Pac. 531; Gleason v. White, 34 Cal. 258; Painter v. Painter, 68 Cal. 395; McPherson v. Swift (S. D.) 116 N. W. 76; Re Amerbach (Utah) 65 Pac. 488.

The probate court has no jurisdiction whatsoever of the settlement or accounting of the partnership liquidation, because such a settlement or accounting can only be litigated in an action in the district court, between the administrator of the estate and the surviving partner or his representative. Tompkins v. Weeks, 26 Cal. 51; Theller v. Pioche, 57 Cal. 447; Andrade v. Court (Cal.) 17 Pac. 531, 532; Re Amerbach (Utah) 65 Pac. 488.

The transactions of the administrator in his conduct of the estate do not violate any of the rules which govern all trustees, including administrators. Comp. Laws 1913, §§ 6281–6287.

The purchase of Ellsworth's share in the partnership by the corporation personally did not violate any trust relation. The former was not a beneficiary of the latter's trust. Comp. Laws 1913, §§ 6281–6284, 6286; Hall's Appeal, 40 Pa. 409.

The copartnership affairs were outside of the trust relationship. Moses v. Moses, 50 Ga. 9; Barker v. Barker, 14 Wis. 142; (see especially opinion on rehearing); Haight v. Pearson (Utah) 39 Pac. 479; Lombard v. Carter (Or.) 59 Pac. 473; Peyton v. Smith, 22 N. C. 325; Allen v. Gillette, 127 U. S. 589; Fleming v. McCutcheon (Minn.) 88 N. W. 434; Bush v. Webster (Ky.) 72 S. W. 364; Mark-

well v. Markwell (Mo.) 57 S. W. 1078; Hollingsworth v. Spaulding (N. Y.) 54 N. Y. 636; Rickey v. Hillman, 7 N. J. L. 180; Earl v. Halsey, 14 N. J. Eq. 332; Jones v. Novies, 22 N. J. Eq. 102; Stark v. Brown, 101 Ill. 395.

But even if appellant himself were precluded from buying out Ellsworth's interest, his disability in this respect would not extend to the corporation, of which he chanced to be president. Cook, Corp. 6th ed. §§ 663, 664.

"A corporation is in law a person or entity, entirely distinct from its stockholders and officers." Cook, Corp. § 663; Owen v. Potter (Mich.) 73 N. W. 976.

The claim purchased in this instance was a valid claim; the estate was not injured nor was there culpability in sharing as a stockholder. Houghteling v. Stockridge (Mich.) 99 N. W. 759; Copsey v. Bank (Cal.) 66 Pac. 8; Clark v. Eaton, 100 U. S. 146; Gray v. Mining Co. 68 Fed. 677–682; Davis & Co. v. Wagon Co. 20 Fed. 699; Monongahela Bridge Co. v. Traction Co. (Pa.) 46 Atl. 99.

The shares of the capital stock of a corporation are essentially distinct and different from the corporate property, and the owner of all the stock of a corporation does not own the corporate property or become entitled to manage or control it. Central Trust Co. v. Bridges, 57 Fed. 753; Richmond & Co. v. Co. 68 Fed. 105, 108; United Mines Co. v. Hatcher, 79 Fed. 517; United States v. Refrigerator Co. 145 Fed. 1007; Halls Safe Co. v. H. H. M. Safe Co. 146 Fed. 37; Victor & Co. v. Am. Graphophone Co. 189 Fed. 359; United States v. D. & H. Ry. 213 U. S. 366; Pullman Co. v. Ry. Co. 115 U. S. 588; Conley v. Alkali Works, 190 U. S. 406; Peterson v. Chicago & Co. 205 U. S. 362.

The purchase by the corporation of the Ellsworth interest is not in law a purchase by appellant himself, merely because he happened to be an officer and stockholder of the corporation. Int. Tel. Co. v. Ry. Co. 51 Fed. 49; LePage Co. v. Cement Co. 51 Fed. 941; Am. Nat. Bank v. Paper Co. 77 Fed. 85; Young & Co. v. Lock Co. 72 Fed. 62; Nat. & Co. v. Conn. & Co. 73 Fed. 491; Electric Ry. Co. v. Co. 61 Fed. 655; Re Horgan, 97 Fed. 319; Re Reiger, 157 Fed. 609; Re Watertown Paper Co. 169 Fed. 252; Re Berkowitz, 173 Fed. 1013; Gelders v. Haygood, 182 Fed. 109.

The "good will" of a deceased partner in the former business cannot be said to be an asset of his estate. It was only personal to himself. It cannot survive him. Sheldon v. Houghton, Fed. Cas. No. 12,748; Read v. Mackey, 95 N. Y. Supp. 935; Slack v. Suddoth (Tenn.) 45 L.R.A. 589; Rice v. Angell (Tex.) 3 L.R.A. 769; Masters v. Brooks, 117 N. Y. Supp. 585.

The good will of a business—not personal reputation—is property. Read v. Mackay, 95 N. Y. Supp. 935; Code, § 5466.

The business of the copartnership was a losing business. Such a business has no salable "good will." This is true because the value of the "good will" is measured by the surplus profits which the business yields over and above expenses, losses, interest on the investment, and reasonable compensation for the proprietor's own services and labor. F. & M. Schaefer Brewing Co. v. Moebs (Mass.) 73 N. E. 858; Long v. Evening News (Mich.) 71 N. W. 492; Whittle v. Davie (Va.) 82 S. E. 724; Nelson v. Hiatt (Neb.) 56 N. W. 1029; Carey v. Gunnison (Iowa) 17 N. W. 881; Re Sullivan, 105 N. Y. Supp. 872; Von An v. Magenheimer, 100 N. Y. Supp. 659; Re Ball, 146 N. Y. Supp. 499.

The administrator had the legal right to employ an agent or broker to find a purchaser of the land. Willard's Estate (Cal.) 73 Pac. 240; Lewis v. Reed, 11 Ind. 239; Armstrong v. O'Brien (Tex.) 15 S. W. 682; Dey v. Codman, 39 N. J. Eq. 258, 268.

*Watson, Young, & Conmy,* and *L. L. Twichell,* for respondent.

In this state, upon the death of a member of a copartnership, the realty belonging to the firm does not become converted into personal property. Personal property and real property descend to the heirs. Comp. Laws 1913, § 5742.

A surviving partner is a trustee of the firm property for the purpose of liquidation of the partnership affairs, and cannot assign his trust. Needham v. Wright (Ind.) 39 N. W. 510; Killifer v. Mc-Lean (Mich.) 44 N. W. 405; Valentine v. Wysong, 23 N. E. 1076; Porter v. Long, 98 N. W. 990; Andrews v. Stinson (Ill.) 98 N. E. 222; Nelson v. Hayner, 66 Ill. 487; Vetterlein v. Barnes, 6 Fed. 693; Comp. Laws 1913, § 6395; Woerner, Administration p. 283; Lay v. Emery, 8 N. D. 515; McPherson v. Swift (S. D.) 116 N. W. 76;

Heath v. Waters, 40 Mich. 457; Drucke v. Boylon (Mich.) 125 N. W. 416; Miller v. Berry (S. D.) 104 N. W. 311.

A surviving partner has the right to sell out his interest in the partnership, but the purchaser obtains nothing but the right to take his interest in the assets after the partnership affairs have been liquidated. Tillinghast v. Champlin, 4 R. I. 173, 67 Am. Dec. 510; 30 Cyc. 605; 22 Am. & Eng. Enc. Law, 104, 105; Reece v. Hoyt, 4 Ind. 169; Chase v. Scott, 33 Iowa, 309; Reinheim v. Hemingway, 35 Pa. 432; Horton's Appeal, 1 Harris, 67; Armor v. Frey (Mo.) 161 S. W. 829.

An administrator can sell, on a proper showing, the interest of the decedent in a partnership. Comp. Laws 1913, § 8768.

He can also make a settlement with the surviving partner, and purchase the interest of the surviving partner in behalf of the estate. Comp. Laws 1913, § 8814; Boyd's Sureties v. Oglesby, 23 Gratt. 674; Roys v. Niles, 18 Wis. 169; Hamilton v. Wells, 55 N. E. 143; Valentine v. Wysor, 23 N. E. 1076.

No executor or administrator can legally purchase any claims against the estate; and if he pay any claim at less than its nominal value, he is only entitled to charge in his account the amount he actually pays, nor must he be interested in the sale of any property of the estate. Comp. Laws 1913, §§ 6282, 6283, 8789, 8819; 11 Am. & Eng. Enc. Law, 982, 983; 1 Perry, Trusts, pp. 198, 199; O'Connor v. Flynn, 57 Cal. 293; Boyd v. Blankman, 87 Am. Dec. 154, 155; 39 Cyc. 296, 298; Sheldon v. Rice, 30 Mich. 297.

Nor must he take or assume any position or interest inconsistent with his trust. The law esteems it a fraud in such a trustee to take, for his own benefit, a position in which his interest will conflict with his duty. Davoue v. Fanning, 2 Johns. Ch. 252; Michoul v. Girod, 4 How. 503; Whichote v. Lawrence, 3 Ves. 740; Lord Hardwicke v. Vernon, 4 Ves. Jr. 411; Ex parte Lacey, 6 Ves. Jr. 626; Docker v. Somes, 2 Myl. & K. 655; Farnam v. Brooks, 9 Pick. 212; Saeger v. Wilson, 4 Watts & S. 501; Rogers v. Rogers, 3 Wend. 503; Torrey v. Bank of Orleans, 9 Paige, 649; Terwilliger v. Brown, 44 N. Y. 240; Beaubien v. Poupard, Har. Ch. 206; Dwight v. Blackmar, 2 Mich. 330; Mocre v. Mandelbaum, 8 Mich. 433; 4 Kent Com. 429; Story, Eq. Jur. 300, 301, 322; Rowell v. Rowell (Wis.) 99 N. W. 473; Moore v. Carey (Ga.) 42 S. E. 259.

Where the executor is the surviving partner he cannot sell the interest of the estate in the partnership to himself as surviving partner. Denholm v. McKay (Mass.) 19 N. E. 551; Miller v. Davidson, 44 Am. Dec. 715.

Neither can he sell to the surviving partner, and then buy back from such partner an interest in the partnership. 15 N. Y. S. R. 721; Comp. Laws 1913, §§ 8046, 8682, 8657.

If he does any of these acts he may be removed from his trust position, or office. Rev. Codes 1905, §§ 8062, 8696.

Property obtained by an administrator in any such manner as were the Ellsworth interests by the appellant, and held for his private gain, is held by him in trust, and must be accounted for as a part of the trust estate. Code 1905, § 8152; Comp. Laws 1913, § 8789.

"The executor is a trustee beyond all doubt." Hare & W. Notes, Cases in Equity, 148 et seq. and 164; 6 Casey 493; 8 Casey 317; 10 Casey 100; 11 Casey 174.

When such relation exists the rule applies as a principle of policy without regard to the honesty and fairness of the transaction, or the merit of the service rendered, or the price paid in case of a purchase. Fox v. Mackreth, 2 Bro. C. C. 400; 1 Lead. Cas. in Equity, 125.

The purchase of the Ellsworth interest in the partnership in the name of the corporation of which appellant was an officer must be held to be a purchase by the administrator without proof of actual fraud. United States v. Milwaukee Refrigerator Transit Co. 142 Fed. 254; MacCaskill Co. v. United States, 216 U. S. 504, 54 L. ed. 590, 30 Sup. Ct. Rep. 386.

"The doctrine of corporate entity is not so sacred that a court of equity, looking through the forms to the substance of things, may not in a proper case ignore it, to preserve the rights of innocent parties, or to circumvent fraud." Re Rieger, 157 Fed. 609; United States v. Milwaukee Ref. Transit Co. (C. C.) 142 Fed. 247; First Nat. Bank v. F. C. Trebcin Co. 59 Ohio St. 316, 52 N. E. 834; State v. Standard Oil Co. 49 Ohio St. 137, 15 L.R.A. 145, 34 Am. St. Rep. 541, 30 N. E. 279.

"The court would not endure that a mere form or fiction or law, introduced for the sake of justice, should work a wrong contrary to the real truth and substance of the thing." Johnson v. Smith, 2 Burr.

962; Morawetz, Corp. § 227; Linn & Lane Timber Co. v. United States (9th Cir.) 196 Fed. 598, 599; Cook, Corp. (6th Ed.) No. 6,663, 664; Smith v. Moore (9th Cir.) 199 Fed. 690; Bermingham v. Wilcox (Cal.) 52 Pac. 822; C. & G. T. Ry. Co. v. Miller, 51 N. W. 981; Rowell v. Rowell (Wis.) 99 N. W. 476; Roberts v. Weimer (Ill.) 81 N. E. 40; Donovan v. Purtell, 75 N. E. 337.

The interests of the buyer and seller of the same property are necessarily antagonistic, and the only safe way or rule is one which absolutely forbids a trustee to occupy two positions, inconsistent with each other. Miles v. Wheeler, 43 Ill. 126; Lovejoy v. Bailey, 101 N. E. 63; Woods v. Irwin, 30 Atl. 233; Cox v. Johns, 32 Ohio St. 532; Campbell v. Walker, 5 Ves. Jr. 678; Sanderson v. Walker, 13 Ves. Jr. 600; Green v. Winter, 1 Johns. Ch. 27, 7 Am. Dec. 475; Piety v. Stace, 4 Ves. Jr. 620; Conway v. Green, 1 Harr. & J. 151; Ryden v. Jones, 1 Hawks, 497, 9 Am. Dec. 660; Perry v. Dixon, 4 Desau 504; 3 Whart. Am. Dig. 276, 278; Guier v. Kelly, 2 Binn. 294; Ex parte Bennett, 10 Ves. 381; Davoue v. Fanning, 2 Johns Ch. 252; Robbins v. Butler, 24 Ill. 387; Woods v. Irwin, 30 Atl. 232.

Where an administrator fraudulently sells land belonging to the heirs, the measure of damages in an action against him is not restricted to the price of the property at the time of the sale, but he will be held liable for its value at the time demand is made for an accounting thereof, with interest. Woerner, Administration, 1137–1139; Century Dig. Exrs. & Adrs. 1589; Dilworth's Appeal, 108 Pa. 92; Bechtold v. Read (N. J.) 22 Atl. 1085.

"Where the executor purchases property of the estate and it is later sold to bona fide purchasers, the executor is chargeable with the value at the time of sale, plus interest." Stiles v. Burch, 5 Paige, 134; Varney v. Saunders, 21 U. S. 292; Roberts' Appeal, 92 Pa. 407; Glass v. Greathouse, 20 Ohio, 503.

The administrator's account should be surcharged with the reasonable value of the partnership property, because of neglect of duty. Rev. Codes 1905, §§ 8071, 8075, 8081, 8131, 8178, 8181; Comp. Laws 1913, §§ 8707, 8711, 8717, 8768, 8816, 8819.

A legal method is provided for an administrator, in selling the estate's interest in partnership property. Rev. Codes 1905, § 8131; Comp. Laws 1913, § 8768.

His duties in respect thereto are defined by law. Molineaux v. Reynolds (N. J.) 35 Atl. 526; Comstock v. McDonald (Mich.) 85 N. W. 579; Woerner, Administration, No. 290; Rev. Codes 1905, § 8071; Comp. Laws 1913, § 8708; Re Robinson, 43 Atl. 207; Gray v. Palmer, 9 Cal. 216; Martin v. Morris (Wis.) 22 N. W. 525.

The administrator in such a case should be charged with the value of the business of the deceased which came into his hands as part of the assets of the estate, and has not been accounted for. This includes the "good will" of the business. 2 Lindley, Partn. 2d Am. ed. pp. 439, 443; 2 Bates, Partn. § 658; Parsons, Partn. 4th ed. §§ 181, 347; Burdick, Partn. pp. 353, et seq.; Washburn v. Dosch, 68 Wis. 436, 60 Am. Rep. 873, 32 N. W. 551; Fish Bros. v. LaBelle W. Co. 82 Wis. 546, 561, 16 L.R.A. 453, 33 Am. St. Rep. 72, 52 N. W. 595; Bank v. Warren, 94 Wis. 151, 68 N. W. 549; Scudder v. Ames, 142 Mo. 187, 43 S. W. 659; Re David & Matthews [1899] 1 Ch. 378; Rowell v. Rowell (Wis.) 99 N. W. 478.

"Good will" is the result of the employment of capital in some established business. It augments its value, and is an incident to the conduct of the enterprise. It exists at the place where the business is conducted, and gives value to the enterprise because of the benefits that are likely to come to a successor and which arise from being connected with its reputation. Bank of Tomah v. Warren, 94 Wis. 151, 68 N. W. 549; People ex rel. v. Roberts, 159 N. Y. 70, 45 L.R.A. 126, 53 N. E. 685; Mitchell v. Read, 84 N. Y. 556; Washburn v. National Wall Paper Co. 26 C. C. A. 312, 81 Fed. 17; Wilmer v. Thomas, 74 Md. 485, 13 L.R.A. 380, 22 Atl. 403; Lindemann v. Rusk (Wis.) 104 N. W. 126.

A person who participates in such an enterprise, reaping its benefits, is in no position, when brought to account, to claim that the "good will" bought was overvalued. Washburn v. National Wall Paper Co. 81 Fed. 20.

"The good will of a decedent's business which is continued after his death as a going concern is an asset of the estate, and should be distributed accordingly." 29 Cyc. 1276; Frey's Estate, 67 Atl. 192; Buck's Estate (Pa.) 39 Atl. 821; Thompson v. Winnebago Co. 48 Iowa, 155; Wilmer v. Thomas, 13 L.R.A. 380, 22 Atl. 403.

The partnership had a clientage. It had a place of business, a name

well established, and a successful business. This was all valuable. Rowell v. Rowell (Wis.) 99 N. W. 478.

"When a stranger and an administrator unite in a purchase of a debt due from the intestate at a discount, they stand in the same relation that the administrator would occupy if he alone had made the purchase, and can recover of the estate no more than they paid for the debt." Cox v. Johns, 32 Ohio St. 532; De Chamouen v. Cox, 60 Fed. 471; Page v. Nagley, 6 Cal. 241; Comp. Laws 1913, § 6283; Mitchum v. Mitchum, 33 Ky. (Dana) 260; 22 Century Dig. "Executors and Administrators" 761 (c); 2 Woerner, Administrators, p. 1157; Seagor v. Wilson, 4 Watts & S. 501.

GRACE, J. Appeal from an order and decision of the district court of Cass county.

The substantial facts in the case are as follows: Hallett H. Jenkins died intestate August 20, 1908. Until about four years prior to the time of his death he was in partnership in the real estate and loan business with one Ellsworth, under the firm name and style of Ellsworth & Jenkins. About four years prior to the time of Jenkins's death he and Ellsworth agreed to dissolve the partnership theretofore existing between them, since which time the partnership did no further business other than that which related to the liquidation of the partnership business, which liquidation matters were being conducted by Jenkins, and were not completed at the time of his death. After the partnership went into liquidation, Jenkins continued the real estate and loan business at Fargo, North Dakota, and was the owner of such business at the time of his death. At the time Jenkins died there survived him his widow, Eva M. Jenkins, and a posthumous child, Hallett H. Jenkins, Junior, who were his sole heirs. Jenkins died August 20, 1908. W. C. Macfadden was appointed administrator September 5, 1908, and duly qualified. E. A. Engebretson was duly appointed guardian of Hallett H. Jenkins, Junior, resigning from such position in May, 1910, when L. L. Twitchell was appointed to succeed him.

Macfadden as administrator filed his first annual account March, 1910, and his final account was filed about the time of his resignation as administrator, which was in the latter part of October, 1910. M.

40 N. D.—28.

W. Murphy was then appointed administrator, and later, in the month of February, 1915, resigned, after which Alexander Bruce, the present administrator, was appointed.

Part of the decedent's estate was in Minnesota and part in North Dakota. The appellant was appointed administrator of the decedent's estate in Minnesota by the probate court of Clay county, Minnesota. His administration of the estate in Minnesota was ancillary to the probating of the decedent's estate in North Dakota. Throughout appellant's administration of the decedent's estate the appellant assumed that the surviving partner, J. H. Ellsworth, and the administrator of the decedent's estate, were tenants in common with respect to the property of Ellsworth & Jenkins partnership, and proceeded with the liquidation of the partnership in consonance with this assumption. Acting on this assumption, the appellant considered the decedent's estate to be the owner of an undivided one-half interest in all the partnership property, and as such administrator sold and disposed of such half interest, and charged his account as administrator with the proceeds.

At the time of Jenkins's death, he had overdrawn his account with the partnership of Ellsworth & Jenkins to the amount of $10,744.14.

In September, 1908, Macfadden, Barney Simonitsch, and Mrs. Eva M. Jenkins, widow of the deceased, organized a corporation under the laws of North Dakota, the corporate name of which was Ells-worth-Jenkins Company, which commenced business operations shortly subsequent to its organization. Of this corporation the appellant was president, Simonitsch secretary and treasurer, and Mrs. Jenkins vice president. Simonitsch was the active business manager. The purpose for which this corporation was organized was one of the matters in controversy between the respective parties to this action. The testimony relative thereto will be discussed more in detail when we subsequently analyze the legal propositions presented in this case.

The appellant as administrator sold the partnership lands to the Ellsworth-Jenkins Company. The appellant as administrator also sold to Ellsworth-Jenkins Company certain land which belonged individually to H. H. Jenkins. The interest of the estate in eleven pieces of land, and in a contract which was known as the Knuth contract, and in the Haworth mortgage, were sold by the administrator to the

Ellsworth-Jenkins Company, and the estate credited with $7,011.97. The corporation also purchased and took over at administrator's sales Jenkins's interest in two pieces of land which he jointly owned with the administrator. The main office of the corporation of Ellsworth-Jenkins Company is at Minneapolis, Minnesota, and the name has been changed to Ellsworth Land Company. Simonitsch had been in the employ of Jenkins for several years next preceding the latter's death, and was employed in the capacity of bookkeeper, and continued in charge of the office of Jenkins for about two months following Jenkins's death, being so employed by the administrator Macfadden for the reason that Simonitsch had knowledge and was familiar with the business which Jenkins had been conducting. That about the month of January, 1909, Ellsworth sold and assigned to the corporation all his interest and rights in the Ellsworth-Jenkins partnership property, the corporation assuming all of Ellsworth's obligations as a surviving partner. The corporation paid Ellsworth for such assignment the sum of $4,000. The circumstances surrounding this transaction will be discussed more in detail in a subsequent part of the opinion, where the legal effect of such assignment will be treated in connection with the relationship of the administrator, the corporation, and Ellsworth, to and with each other.

These are the main facts around which the legal propositions range themselves. It is not necessary, and the statement of facts would be exceedingly long, were all items thereof incorporated in the statement of facts. There are several hundred items, and no further reference need be made to them, excepting as they appear to be such items as are controverted. We will therefore direct our attention to the analysis of the legal questions presented to us by this appeal.

This action is one for an accounting, and such accounting involves many hundreds of items. It would be impractical to attempt to write a statement of facts which would refer to all the facts in this case, or to the many hundreds of items of the account. Though no reference may be made to many of the facts, either in the opinion or the statement of facts, they nevertheless will have been considered.

The trial court found a balance due from the appellant to the respondents of $26,217.65.

We will direct our attention to the analysis of the legal questions

presented to us by this appeal in order to determine whether the trial court was in error in deciding the legal questions in the case in the manner in which it did. If the trial court's theory and conclusion upon the various legal questions presented to it at the trial are correct, the balance which it found due and owing from Macfadden to the respondents is substantially correct.

The case is one exceedingly complicated, and presents the necessity of separating the main questions from the mass of material presented, in order that the cardinal legal propositions may receive consideration by this court. The cardinal legal questions presented in this case are quite numerous. Each should receive a separate and thorough consideration, and with that end in view are classified in the order of their importance as follows: (1) The Ellsworth-Jenkins Company, its organization and purpose; (2) the partnership, its organization, dissolution, and liquidation; (3) the administrator, his duties, the nature of his relation or trust, his failure to perform them, and his liability therefor. Under this head may also be included the fraud, either legal or actual, of the administrator, if any.

These subdivisions include all the major questions of this case. Other minor questions there are, but they naturally group themselves about one or the other of these main subdivisions, and are largely dependent upon them or some of them. The disposition of the major questions of law involved in the three subdivisions necessarily carries with it a disposition of the minor questions of law.

Addressing ourselves to the first of these legal propositions, the Ellsworth-Jenkins Company, a corporation, we find it is incumbent upon us to determine from the records the purpose of this corporation. To do this it is necessary to examine all the surrounding circumstances attending its organization, and from such source draw our conclusion as to the reason of the origin and existence of such corporation. Ellsworth & Jenkins had been engaged in the real estate and loan business for a number of years, and accumulated and held considerable property, both real and personal. The partnership was dissolved about four years prior to Jenkins's death, and Jenkins continued the business for himself, and while doing so was also liquidating or trying to liquidate the partnership of Ellsworth & Jenkins. At the time of Jenkins's death he owned an undivided one-half inter-

est in all the property of Ellsworth & Jenkins, subject to any partnership liabilities. Such partnership owned at the time of Jenkins's death various tracts of land in the state of North Dakota, and some in Minnesota. Jenkins also owned several tracts of land individually, and owned a couple of tracts in common with Macfadden, the appellant.

The respondents claim that the corporation was organized at the solicitation of appellant under the representation that it would be a convenient method of handling the business of the estate and facilitate the handling thereof. The appellant claims there was no such purpose in the organization of the corporation. It seems from exhibits in the record that the authorized capital was $25,000, which was later increased to an authorized capital of $50,000, the par value of the shares being $100 each. When the organization was perfected with the officers we have enumerated in the statement of facts, each of the incorporators, Macfadden, Simonitsch, and Mrs. Jenkins, were given fifteen shares each at the organization meeting in October, 1908. The forty-five shares were entered on the books, crediting capital with $4,500, and charging loss and gain with a similar amount. In connection with the issuing of the stock, a notation was made on the books of the company as follows: "Paid for good will of company fifteen shares stock to E. M. Jenkins, fifteen shares to Macfadden, and fifteen shares to B. Simonitsch."

What is the meaning of such entry? Why was such entry made? The able counsel for appellant contends in his brief that "the entry manifestly does not purport to be any contract on the part of the corporation whereby it agreed to buy Jenkins's business and good will and pay $4,500 therefor." The same counsel also uses the following language: "If the entry is evidence against Macfadden at all, it could only be as an admission, but what does it admit? If it admits anything, it only admits that the company gave fifteen shares of stock to each of the three incorporators for such good will as it acquired from them." And the same counsel continuing says: "The plain language of the entry means, and could only mean, that the corporation was issuing to each of the three incorporators fifteen shares of stock for their good will."

The able counsel further undertakes to substantiate this view by

showing the stock was charged to loss and gain. But is the reasoning of the counsel sound when examined by the searchlight of surrounding circumstances? If, as the appellant contends, this corporation was organized for the purpose of conducting a real estate and loan business, and without taking into consideration, or having any reference to Jenkins's estate, if it were organized for the purpose of going abroad to seek its business upon its own initiative and responsibility, to build up its own business by advertising, to make its real estate loan connections, and its real estate connections, it is hardly to be conceived they would have thought of taking Mrs. Jenkins into such corporation. It does not appear from the testimony she was a business woman, that she ever had any experience in real estate business or in the loan business, or that she was ever engaged in any similar business; neither does it appear that she was possessed of any capital outside of what she might receive from her husband's estate and his life insurance. It does not appeal to one's reason that a woman, under these circumstances, would be taken into such a corporation which subsequent events showed to be a very paying institution, unless she was valuable in some way to such corporation. Simonitsch had been the bookkeeper for Jenkins; he was to be the secretary and business manager of the new corporation. What did he bring to the corporation? What did he put in at the inception of such corporation? Did he contribute capital when the corporation was organized? What did Macfadden contribute to the corporation in its inception? It does not appear that he put any money in at the outset. There is some testimony regarding certain notes given by Macfadden and Simonitsch, to which we will later refer. Macfadden was connected with a certain bank in Fargo, but whether such connection was to aid the new corporation we cannot say, but certain it is that the bank had no connection with the corporation. What did the new corporation do? Into what field did it go seeking its first profits? Did they spend some money advertising? Did they have correspondence with people who had money to loan? Did they expend any money for traveling to build up real estate and loan connections? Did they start out to build up a brand new business without any reference to Jenkins's estate? The appellant contends that the good will referred to meant the good will of the three individuals who formed such corporation. Such contention we believe to be untenable. The

words, "good will," as used in connection with the sale of an established business, have in law a well-understood meaning. Words & Phrases contain several definitions of the term, "good will," as defined by cases therein cited. Some of them are as follows:

"The good will of a partnership may be defined as every possible advantage acquired by the firm in carrying on its business, whether connected with premises, name, or other matter. Farwell v. Huling, 132 Ill. 112, 23 N. E. 438."

" 'Good will' as used in sales of business or professional locations, and the good will of the business, includes not only the established business and patronage or clientage thereof, but also an implied covenant that the seller will not engage in the same business in the same locality. French v. Parker, 16 R. I. 219, 27 Am. St. Rep. 733, 14 Atl. 870."

"The good will of a business is not the business, but is one result springing out of it. It would be too narrow to construe the word 'business' to be the good will of the business. McGowan v. Griffin, 69 Vt. 168, 37 Atl. 298."

In the case of Bristol v. Bristol & W. Waterworks, 23 R. I. 274, 49 Atl. 974, it was said: "The probable retention of customers is what is meant by the 'good will.' "

"The good will of a business is the reputation it has established in the community, including the customers which usually trade there, and therefore, if a business is sold and with it the owners' good will, that amounts to a warranty that the seller will not thereafter attempt to draw off any of the customers which he had previously had, from the purchaser. Snow v. Holmes, 71 Cal. 142, 11 Pac. 856."

"The good will of a partnership includes among other things the tradename, to the extent that the purchaser may stand as a successor of the former firm; and upon the death of the last survivor of a firm, although no provision for the sale of the name is made by statute, and although that name itself is not assignable by the administrators, still they may sell, in addition to the property and trademarks, the good will of the firm, which shall include the right of the purchaser to advertise himself to the public thereafter as being the successor to the property and business of the firm which has become extinct. Fisk v. Fisk, 77 App. Div. 83, 79 N. Y. Supp. 37."

"As used in a contract of sale whereby a partnership is dissolved,

and one of the partners transfers to the others all his interests in the firm business and assets, together with the good will, with the under-standing that they are to succeed to the business of the old firm, the term 'good will' includes the firm name. Brass & I. Works Co. v. Payne, 50 Ohio St. 115, 19 L.R.A. 82, 33 N. E. 88." [4 Words & Phrases, 3128–3130.]

Section 5465, Comp. Laws 1913, reads as follows: "The good will of a business is the expectation of continued public patronage, but it does not include a right to use the name of any person from whom it was acquired."

Section 5466 reads as follows: "The good will of a business is property, transferable like any other."

In the case of Mapes v. Metcalf, 10 N. D. 601, 88 N. W. 713, the principle is recognized that the sale of "good will" may become the subject of contract.

. The respondent claims that the only good will that Jenkins had was the same kind of good will that a lawyer, doctor, or professional man acquires, and as to that kind of persons it is nothing but a personal reputation, and is not the kind of a good will which attaches to a trading or manufacturing business, or business of similar character, claiming in the latter cases the good will attaches to the business or establishment itself, and that good will must always rest upon some property, or tangible thing, and that it can never arise as an asset of a partnership where the members only contribute as capital their professional skill and reputation. The respondent further claims that the firm name cannot become a part of the good will in cases of business which depend upon the personal attributes of the partners engaged therein, and that no forced sale or transfer can be made of the good will when based upon reputation, standing, or business connections.

To sustain this view the respondent cites the case of Sheldon v. Houghton, 5 Blatchf. 285, Fed. Cas. No. 12,748; Read v. Mackay, 47 Misc. 435, 95 N. Y. Supp. 935; Slack v. Suddoth, 102 Tenn. 375, 45 L.R.A. 589, 73 Am. St. Rep. 881, 52 S. W. 180; Rice v. Angell, 73 Tex. 350, 3 L.R.A. 769, 11 S. W. 338; Masters v. Brooks, 132 App. Div. 874, 117 N. Y. Supp. 585.

It may be observed there is a division of authority upon these matters. The rule contended for by the respondent is rather the old and

narrow rule first laid down by Lord Eldon, which was: "Good will means nothing more than a probability that the old customers will resort to the old place," but Vice Chancellor Wood in the case of Churton v. Douglas, 5 Jur. N. S. 887, a leading case, said: It would be taking "too narrow a view of what is laid down by Lord Eldon there to say that it is confined to that. 'Good will,' I apprehend, must mean every advantage—positive advantage, if I may so express it—as contrasted with the negative advantage of the vendor not carrying on the business himself, that has been acquired by the old firm carrying on its business," whether connected with the premises on which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business.

The law, as other big institutions of modern society, is advancing. It has broadened in its conception of human rights, including property rights. Things which were not considered property several decades in the past, by reason of the evolution and development of modern society have become property rights. Professional business, such as surgery, dentistry, law, and many other kindred professions, have with the march of progress made big advances, and the law applicable to such professions has advanced. Good will by reason of the great progress of society is considered to be a property right in a great many instances, and under a great many conditions to which it was formerly held not to apply. Under the more modern view, courts are extending the meaning of good will so that even professions may be included.

We quote from 12 R. C. L. p. 978 as follows: "While it has frequently been held that in commercial or trade partnerships only can good will exist, and that it cannot arise in a professional business depending on the personal skill and confidence in the particular partner, yet, where a person acquires a reputation for skill and learning in a particular profession, as, for instance, in that of a lawyer, a physician, or an editor, he often creates an intangible but valuable property by winning the confidence of his patrons, and securing immunity from successful competition for their business, and it would seem to be well settled that this is a species of good will which may be the subject of transfer, and the courts have not infrequently adjudicated rights relating to good will in such cases with seemingly no question as to the real-

ity of the existence of this property right. The good will of a professional business or practice often forms an exception to the general rules relating to good will." Cowan v. Fairbrother, 118 N. C. 406, 32 L.R.A. 829, 54 Am. St. Rep. 733, 24 S. E. 212; Morgan v. Perhamus, 36 Ohio St. 517, 38 Am. Rep. 607; French v. Parker, 16 R. I. 219, 27 Am. St. Rep. 733, 14 Atl. 870; Cook v. Johnson, 47 Conn. 175, 36 Am. Rep. 64.

In the case of Cowan v. Fairbrother, supra, the court said, with reference to good will: "Neither an editor, a lawyer, nor a physician, can transfer to another his style, his learning, or his manners. Either, however, can add to the chances of success and profit of another who embarks in the same business in the same field by withdrawing as a competitor. So that the one sells and the other buys something valuable, and the policy of the law limits the right to enter into such contracts of sale only to the extent that they are held to injure the public by restraining trade. The one sells his prospective patronage, and the other buys the right to compete with all others for it, and to be protected against competition from his vendor."

The case of Tichenor v. Newman, 186 Ill. 275, 57 N. E. 826, is one where a physician sold certain property and the good will in a general medical practice to another, and contracted to perform certain acts for the purpose of securing to the purchaser such good will. To facilitate the transfer of the good will, the seller and purchaser formed a partnership. The seller was to make known the fact of the partnership and introduce the purchaser to the families of the different patrons of the physician as a man worthy of confidence, and so far as possible establish the purchaser in the practice. The seller failed to keep his contract, and the purchaser brought an action for damages, and the court held that an action at law to determine the damages was maintainable, and that such action did not involve an adjustment of the partnership accounts. That Newman, the seller, contracted to deliver to Tichenor certain property and the good will of his business. The obligations of Newman as to the real estate and good will were held to be personal to Tichenor,—not the firm.

Largely to the same effect is the case of Dwight v. Hamilton, 113 Mass. 175, and also the case of Butler v. Burleson, 16 Vt. 176.

In the case of Bloom v. Home Ins. Agency, 91 Ark. 367, 121 S. W. 293, ¶ 3 of the syllabus is as follows: "Good will is the possibility that old customers will resort to the old place for the purpose of trade, and is recognized as a thing of value which may be sold."

In some instances good will is said to be the subject of appraisal and inventory as an asset of an estate, and transmissible by sale. Re Vivanti, 138 App. Div. 281, 122 N. Y. Supp. 954.

In Maxwell v. Sherman, 172 Ala. 626, 55 So. 520, it is said: "The good will of the business is property which the law protects and for injuries to which damages may be recovered."

In 20 Cyc. 1277, it is said: "The good will of an established business is incorporeal property which may be mortgaged, sold, or leased in connection with the business, but it cannot be sold by judicial decree or otherwise, unless it be in connection with the sale of the business on which it depends."

The trial court made a finding of fact that Mrs. Jenkins joined in the organization of the corporation with the understanding and with the suggestion made to her that the corporation be organized to continue her husband's business at the same place; that the corporation would take over the estate lands; would be used as a corporation to which all property of the estate would go for convenience, but that in the end all profits would appear assembled for the benefit of the estate, and those who shared with her in carrying on the corporation. The trial court also found that the Ellsworth & Jenkins Company took over and acquired the good will of the decedent which at that time was an asset of the H. Jenkins estate and worth the sum of $4,500; and that it ought to have been inventoried and accounted for as an asset of the decedent's estate.

While this is a special proceeding, and the trial court's findings of fact are not conclusive upon this court, they nevertheless should have great weight, and should not be disregarded unless the trial court is plainly in error. We see no reason why the findings of the trial court on these matters should be disturbed.

Mrs. Jenkins, in answer to a question as to the purpose of the organization of the corporation, testified that it was to sell the land and carry on the business.

The appellant seeks to show that there could be no good will for the

reason that Jenkins's business was not a paying one.  This is a disputed question between the parties, the respondent making a very good showing that the business was a paying one, and the appellant on a different theory sets forth what he claims to be good proof that it was not a paying business.  We are of the opinion that neither the fact that the business is very profitable or successful, nor that it is not a very profitable and even a losing business, is the only test of good will.  A business may not be profitable, and may even be a losing business, and still be possessed of a good will.  Where a business is very profitable it is apparent that those who deal with the owners of such business are the persons upon whom such good will depends.  If they like the person or the company engaged in the business, even though they are aware of all the profits which the owners of such business are making and which the clients of such business are paying, such business may be said to have a good will.  On the other hand, the business of a person, company, or partnership that pays poorly, and even sustains a loss, may have a very good will.  If, for instance, the company is a mortgage loan company loaning money upon farms, if it has made its loans at a very moderate rate of interest and has not made much profit thereby, its business might not be a paying one.  It might even be a losing business.  Yet, the clients who received the loans from the company might be exceedingly well satisfied, having received a cheaper rate of interest, or having had their business done for them for a more moderate charge than was customary.  Such clients might have, and most likely would have, a very good feeling towards such company who did their business and made them their loans at a lesser rate of interest than other companies doing a more profitable business loaned their money.  Such company doing a losing business might have a very good name and a good reputation, and might have the good will of all or most of the clients with which it did business, and there would be, therefore, a desire of such clients to continue business relations which were satisfactory, agreeable, and profitable to the clients.

As we view the matter, a profitable business is not necessarily accompanied by the good will of its clients, nor does it follow that a business which pays poorly or which is operated at a loss is not

possessed of a good will, in view of the fact that good will may be said to be a desire of old clients to resort or return and continue business relations where the clients have been accustomed to do business, and such clients are just as apt to return and continue business with those who have not made so much profit for them as they are to return and do business with those who have taken much profit from them.

We cannot take space and quote any more testimony, but we are of the opinion that as a whole it tends strongly to support the findings of the trial court; that the findings of the trial court are strongly supported by many of the circumstances attendant upon the organization of the corporation, and the business transactions by it subsequent to its organization.

In the light of these definitions and the surrounding circumstances attendant upon the organization of the corporation, appellant's contention that the good will referred to was the good will of the incorporators, is not maintainable, and we cannot agree that the notation made upon the books with reference to good will had any reference to the good will of the incorporators of the corporation. We are of the opinion that such notation referred to the good will of the Ellsworth & Jenkins Company. Upon the dissolution of the partnership of Ellsworth & Jenkins, Jenkins succeeded to the name and good will of the Ellsworth & Jenkins Company. It was a company which had been in existence for a long period of time; had transacted a great deal of business both at home and abroad; it had built up business connections in other states for the loaning of money. It had undoubtedly become a firm whose name was well known. We conclude that the good will referred to in the notation on the books referred to the good will of Ellsworth & Jenkins.

Turning to the consideration of the partnership, we find that it is one organized and formed for the purpose of conducting a real estate and loan business, the members of the same being J. H. Ellsworth, of McGregor, Iowa, and H. H. Jenkins. The partnership had been engaged in business for a considerable period of time prior to 1904, when it was dissolved by mutual consent, and Hallett H. Jenkins succeeded to the business and the firm name, and continued the business until the time of his death, in August, 1908, and, after the disso-

lution, was also trying to liquidate the partnership, and was the liquidating partner until the time of his death. During the existence of the partnership there was accumulated considerable partnership property, a complete list of which appears in the testimony and findings of fact by the court. Shortly subsequent to the death of Jenkins, Macfadden was appointed the administrator of his estate. As such administrator he assumed that he was a tenant in common with J. H. Ellsworth, the surviving partner, in all the partnership property, and proceeded upon this theory. In pursuance of this theory the partnership property was inventoried by the administrator, petitions were filed in the county court for license to sell the various partnership lands, and permission was granted by the court to make sale thereof, and sales of the same were made to Jenkins-Ellsworth Company through the county court, which sales were confirmed by the county court. No appeal was taken from any of the orders of the county court with reference to such sales, and they became final orders until some action is directly maintained to set them aside and establish their illegality. During Macfadden's administration of the estate large amounts of personal property came into his possession, such as life insurance, bills receivable, proceeds of crops from the land, and other items of personal property,—all of which the court has in a proper manner charged to Macfadden's account.

It appears, the theory that the administrator and the surviving partner were tenants in common is erroneous when viewed in the light of § 6425, Comp. Laws 1913, which is as follows: "On the death of a partner the surviving partners succeed to all the partnership property, whether real or personal, in trust for the purposes of liquidation, even though the deceased was appointed by agreement sole liquidator; and the interest of the deceased in the ultimate distribution of the partnership assets passes to those who succeed to his other personal property."

This statutory provision is somewhat peculiar to North Dakota, most of the other states having no such statute. It will be observed that this statute vests all partnership property in the surviving partner in trust for the purpose of liquidation. The appellant claims that the heirs or legal representatives of the deceased partner acquire no

title to the partnership property, but only a claim or cause of action for the final balance representing the deceased partner's share of the final settlement of the partnership affairs; and that such interest in the ultimate distribution of the assets is personal property, and must be disposed of as such even though the assets may consist entirely of real estate. The appellant intended the force of this argument to be, as based upon such statutory provision, that neither the heirs nor administrators of Jenkins's estate had any title to any part of the real or personal property belonging to the Ellsworth & Jenkins partnership; that they acquired only the right to receive any balance of money or property ultimately remaining, and which would be due the estate of decedent after the settlement of all partnership affairs. From this reasoning the appellant contends that the probate court never acquired any jurisdiction over any of the partnership property in the administration of Jenkins's estate, and contends that all the sales made through the county court of Jenkins's undivided half of the partnership lands were nullities, and that the entire title to all the property was in Ellsworth or his assignee in trust.

The district court, while recognizing the force of the statute in question, assumed the position that none of the orders of the county court, including those confirming the sales of Jenkins's undivided half in the partnership lands, having been appealed from, they became final, and would be treated as valid orders so far as the proceedings in the district court was concerned, and took the position that the administrator having a trust to perform, and it having been shown that he was the president of the corporation to whom such undivided half of the partnership lands belonging to Jenkins was sold, and at the time of such sales was the administrator of Jenkins's estate, and that such sales were in violation of his trust as such administrator, he should be held to be liable as for equitable conversion for the value of Jenkins's one half of such lands and property, the value of which was to be determined so far as the conversion was concerned by the price for which Jenkins's half interest in such lands was sold by the county court on the petition of the administrator.

All partnership real estate, under the circumstances of this case and under the laws of this state, is considered as personal property,

and the purchase price for which any land was sold through the probate court, which purchase price came into the hands of the administrator or under his control, is personal property,—all of which could be the subject of conversion.

The court further held that the value of such undivided one half of the partnership lands would not preclude respondents in a proper action from showing the real value of such land, but that in the action in the district court by reason of the apparent validity of the order of the county court, while they remained in force and not set aside by direct attack thereon, they were to be considered valid. Proceeding upon this theory, the district court itemized the property converted, and ordered that the order of the county court of Cass county, dated November 7, 1914, settling the account of the administrator, W. C. Macfadden, be vacated and set aside, and the report and account of said W. C. Macfadden as administrator of the estate of H. H. Jenkins, deceased, were settled and allowed as stated in the findings of the district court; and further ordered Macfadden to turn over to the present administrator, Alexander Bruce, the sum of $26,217.65, with interest from the 1st day of February, 1916, which was the amount of property of the estate of Jenkins which the district court found had been converted by Macfadden as administrator.

Assuming at this point, before we have analyzed the trust relations of the administrator, that the transfer of the property by the administrator through the probate court to the Ellsworth-Jenkins Company was in effect a transfer to himself, he being interested in the corporation and sharing in the profits thereof; and assuming, further, as the learned district court has found, that Macfadden was guilty of legal and actual fraud in the execution of his office of administrator in forming a corporation to which the lands and property in question were transferred, we are of the opinion that the procedure in the district court holding Macfadden liable as for equitable conversion of the property was proper, and we see no reason to interfere with the court's conclusion and orders resulting from its theory of the liability of Macfadden.

The meaning of § 6425, hereinbefore fully set out, is that the surviving partner has possession of all of the partnership property. That by operation of law the equitable title to all the partnership property,

whether real or personal, vests in the surviving partner or partners immediately upon the death of one of the partners, but in trust only, and for the sole purpose of liquidating the partnership. This being true, the equitable title to all the partnership property upon the death of Jenkins having by operation of law vested in Ellsworth in trust, and in trust only, there remained but one duty for Ellsworth to perform, and that was to liquidate the partnership. In the process of the liquidation of the partnership the surviving partner could sell all of the partnership property and use the proceeds to discharge the liabilities or debts of the partnership; and where the purchaser of such partnership property, in case of such sale, is an innocent purchaser, and has no notice of the trust relations, and the surrounding circumstances are such as not to put a prudent person upon inquiry, such purchaser will be held to hold such property free, and not impressed by any trust. But if the purchaser has knowledge of the trust relations, or by reason of the circumstances and facts ought to have known of the trust relations, he will be held to have purchased such property impressed with the trust. Where, as in this case, the surviving partner undertook to sell all his interest in the partnership, and did sell the same to a person who had knowledge of the partnership affairs and trust relations, or who was in such position that he must be held to have known of the trust relations of the partnership and the trust character of the property when he purchased the same, he takes such property impressed with the trust and holds it subject to the trust impressed thereon, and in fact can have no greater rights than the trustee from whom he received such property, which would be the right only to liquidate the partnership and to share in the balance of the partnership property or money, remaining after the payment of all liabilities of the partnership, in proportion as the interest of the partnership which he purchases bears to the whole partnership.

This would be the right, and the only right, the purchaser of an interest in the partnership would acquire even if the purchaser were not responsible and accountable by reason of certain other trust relations which would result if the purchaser was bound by trust relations arising out of the administratorship of the estate of Jenkins.

The corporation, in addition to claiming the ownership of Jenkins's interest in such partnership and partnership property by reason of

40 N. D.—29.

such purchase, claimed the ownership of a certain claim and the right to collect $10,000 and interest against the estate of Jenkins. Even if there were no other trust relations on the part of the purchaser which conflicted with this purchase, we believe the true rule to be that where one partner has made advances to the firm, or another has received advances from it, such advances do not constitute debts, strictly speaking, until the partnership is wound up, but such advances really only constitute items in the account between the parties. Where one of the partners has made advances to the firm, he is not really a creditor of the firm. He has no means of compelling payment of his debts unless he has taken separate security. The only way the creditor could proceed in such case to collect his debt would be to proceed to dissolve the partnership and have the property applied to the discharge of his obligation, or proceed in equity for an accounting. It would seem to be well settled that all such advances made or received can only constitute items of account, and until there is a full accounting or liquidation, the exact status of the account between the parties cannot really be determined. If a partner has made advances to the partnership, upon an accounting it might be shown that his share of losses sustained were greater than the advances made, and it would seem until the amount of profit and loss be ascertained by a full accounting, or the complete liquidation of the partnership affairs, no partner has a remedy against, or liability to, the others for payment of advances. It would seem that where an advance is made to one of the partners, his manner of reimbursement would proceed as follows: After an accounting or liquidation of the partnership, the profits of the partner to whom such advancement is made would be first applied in payment of the advance, and if that is insufficient, then his capital should be applied, and after that he would then be considered a debtor to the partnership, and he having no more property or interest in the partnership out of which to pay such obligation which will be determined on a full accounting and liquidation of the partnership, then recourse would be had to his individual property for the payment of such balance. In other words, advances made or received in partnership matters do not establish the relation of creditor and debtor. In the case at bar, until a full accounting was had, and until the partnership was fully liquidated, as a matter of law,

there could be no claim against any of the partners individually for advances made or received; nor could a claim be filed against the estate of the deceased partner until there had been a full accounting or liquidation of the partnership, by which determination of the amount of the individual claim, if any, could be had, and a showing that all his interest in the partnership, whether of profits or capital, had been first applied to the discharge of such obligation.

The general rule is stated in 30 Cyc. page 461, and is as follows: "As a rule an action at law by one partner against his copartners will not lie on a claim growing out of the partnership transactions until the business is wound up and the account is finally settled."

Under this note is cited numerous cases from many of the states supporting this rule. Analyzing this rule, the following language will be found in 30 Cyc. page 461: "It follows that a partner cannot sue a copartner on a contract between himself and the firm in the absence of legislation permitting it; nor can he maintain trespass or replevin against his copartner for any part of the firm property. The remedy of the complaining partner in such cases is to be sought ordinarily in an equity action for an accounting and settlement of the partnership affairs. The principal reasons for requiring an accounting and settlement between copartners as a condition precedent to an action at law by one against another upon partnership claims and transactions are these: (1) A dispute of this nature ordinarily involves the taking of a partnership account, for until that is taken it cannot be known but that plaintiff may be liable to refund even more than he claims in the particular suit; (2) in partnership transactions a partner does not as a rule become the creditor or the debtor of a copartner, but of the firm."

These principles are sustained by a great number of decisions from various states. (See 30 Cyc. 463, and cases cited.) This being true, it would seem to follow conclusively that a claim could not be filed against the estate of an individual partner until there had been an accounting of the partnership or a liquidation thereof, and the balance, if any, of money or property due the individual partner first applied upon his obligation before he could be proceeded against as a debtor and sued, or, in case of his death, a claim be filed against his estate. Even though the testimony in this case tends strongly to show,

and even though it is conceded that Jenkins had overdrawn his account in the partnership, or had received $10,000 more of the partnership fund or property than Ellsworth, yet, as a matter of law, he could not have been sued upon such claims under such circumstances until a full accounting had been had, or the partnership fully liquidated, and in the event of his death the claim could not be filed against his estate by the surviving partner, or anyone else to whom such surviving partner had sold his interest, until full accounting of all partnership matters had been had, and the liquidation of such partnership fully completed, and the balance, if any, of partnership property due or belonging to the deceased partner first applied upon his obligations. There has never been a full accounting of the partnership affairs of Ellsworth & Jenkins Company, nor has the partnership been liquidated. The corporation which assumed to purchase Ellsworth's interest in the partnership and assumed to purchase the $10,000 claim against Jenkins had no greater rights than Ellsworth would have had. The corporation, therefore, in law could not file the $10,000 claim, with interest against the estate of Jenkins, in the absence of a showing of a full accounting of the partnership and the liquidation thereof. This is the position in which the purchaser of Ellsworth's interest in the partnership would be if such purchaser was not charged with other trust relations relative to such property. Other trust relations, however, exist in the case at bar, and arise out of the trust relations of Macfadden as administrator of Jenkins's estate. Macfadden was the president of the corporation, and under the evidence and circumstances of this case had, or must be held to have had, knowledge of all the partnership affairs, the trust character of the partnership property, and his trust relations as administrator.

We will now consider the position of the administrator and his trust relations. It is elementary that the position of the administrator of the estate of a deceased person is a position of trust, and that all the property of the estate, whether it be real or personal, is impressed with such trust. It is a general principle of law thoroughly established that it is the duty of an executor or administrator to care for the estate and act in relation thereto for the exclusive benefit of the *cestui que trust,* and that such administrator or executor cannot profit individually from his dealings with the estate. On the con-

trary, he must act in the highest of good faith, and not seek to acquire any adverse interest in the estate. 11 Am. & Eng. Enc. Law, 982.

Section 6282, Comp. Laws 1913, is as follows: "A trustee may not use or deal with the trust property for his own profit or for any other purpose unconnected with the trust in any manner."

So far as material to this case, § 6283, Comp. Laws 1913, is as follows: "Neither a trustee nor any of his agents may take part in any transaction concerning the trust in which he or any one for whom he act as agent has an interest, present or contingent, adverse to that of his beneficiary."

The rule is well settled that the trustee administering the trust must act for the beneficiary, and not for himself; his acts must not be antagonistic to the interests of the beneficiary; he cannot use his position to gain a benefit for himself, nor place himself in a position where his own interest will or may conflict with his duties as trustee. 39 Cyc. 296.

We quote from 39 Cyc. page 366, and cases therein cited: "The law does not stop to inquire into the fairness of the sale or the adequacy of price, but stamps its disapproval upon a transaction which creates a conflict between the self-interest and integrity of the trustee. The rule embraces not only direct purchases, but also indirect purchases through third persons, and applies regardless of whether the sale is private or under decree, or whether the *cestui que trust* is an infant or an adult, and even though the purchaser is one of several cotrustees, or is acting as agent for a third person. The rule is also applicable where the trustee is a corporation *or where the trustee transfers property to a corporation in which he is a large owner."*

It would hardly seem possible that a trustee, such as an administrator or executor, could in good faith, either directly or indirectly, acquire an interest or benefit from the property which in his relation as trustee he holds, controls, or sells for his *cestui que trust*. It is his duty when selling such trust property to sell it to the greatest advantage possible for his *cestui que trust*. It is his duty to make the best sale for the highest price obtainable. If the trustee is permitted to become purchaser of the property which he is selling, it is self-evident there is an interposition of his own self-interest adverse to that of the *cestui que trust*. To permit such to be done would open wide the flood

gates of fraud, and ofttimes permit unscrupulous trustees who desire to advance their own selfish interest and individual profit to acquire interest adverse to the *cestui que trust*.

In the case at bar, Macfadden was appointed administrator of Jenkins's estate. The respondent in effect claims that matters were so manipulated by Macfadden as to secure his appointment. However this may be, it does appear that the petition for his appointment was signed by Mrs. Jenkins while she lay desperately sick in the hospital. Her husband was suddenly stricken by death. The shock of her husband's death prostrated Mrs. Jenkins, and she was in the hospital for a considerable period of time very ill.

An examination of the testimony and all the circumstances surrounding the case indicates at least that there was no particular need for haste in his being appointed administrator. The appointment was made, however, and the administrator duly qualified and entered upon the discharge of his duties. Some time after Macfadden's appointment as administrator, and after he entered upon the discharge of his duties as administrator, the idea of the corporation was conceived by Macfadden, or Macfadden and Simonitsch. The purpose of such corporation as found by the trial court was for the convenient handling of the property of the estate, taking over the estate lands and the continuing of the business of H. H. Jenkins, who, as we have seen, succeeded to the business of Ellsworth & Jenkins. We think the court was correct in making such finding; that the testimony tends to support such finding; and the same will not be disturbed.

If the corporation was organized for taking over the lands and the business of Jenkins, and was to be an organization through which most of the estate's business should be handled, and if, as subsequently appeared, a large part of the estate's property and interest were sold to such corporation, it is self-evident there would be a direct conflict of the trust relations of Macfadden as administrator of the estate, with his self-interest represented by the corporation of which he was president, and which corporation became the purchaser of a great deal of the estate's property. It is apparent that it would be to the interest of Macfadden as a part owner of the stock of the corporation to purchase the property from the estate of Jenkins as cheaply as it could be purchased. As administrator under these circumstances it

would be to Macfadden's personal interest and individual gain to sell the lands and property of the estate at as low a price as he could to the corporation. Macfadden could not under these circumstances sell the property to the corporation thus formed and remain true to his trust of administrator, nor remain in a position to protect the interest of the *cestui que trust*. His trust relations as administrator were in direct conflict with his relations with the corporation of which he was president.

Upon an examination of the entire record in this case it is clear that Macfadden gained an advantage for himself by selling the property of the estate to the corporation. The appellant cites the case denominated Hall's Appeal, 40 Pa. 409, wherein he undertakes to prove the principle, by the citation of several cases, that the administrator or executor may purchase interests of decedent's estate; as, for instance, where one partner dies and the legal title to the property and assets was in the surviving partner, and were purchased by the administrator of the deceased partner's estate; or, as where the administrator purchased the interest of a share of an heir or legatee in the estate. The main cases, among others cited by the appellant to sustain this contention, are the case we have just discussed, and the case of Stark v. Brown, 101 Ill. 395. The cases cited to some extent tend to support the appellant's theory, but even so, we do not believe they are the weight of authority, but, if they may be considered authority at all, are exceptions to the general rule. If an administrator or executor can purchase the interest of the legatee or an interest in the estate property, and by his doing so secures an advantage to himself in money or property, he does so in violation of his trust as administrator.

Where a partnership is dissolved by death, and all the partnership property passes to the surviving partner, it passes only in trust, and the representatives of the deceased partner have an exclusive right to the ultimate balance of money or property remaining after the liquidation of the partnership. By what manner of reasoning, then, could it be held lawful for the administrator of the deceased partner to purchase the partnership property, directly or indirectly, if in doing so he made an individual profit and gained any money or property? It is clear that such a purchase would be in direct violation of the trust duties of the administrator. If it is ever possible for the administrator or exec-

utor to purchase property of the estate or legatee, or a partnership, where he is the administrator of the deceased partner, it would be only where the administrator or trustee can affirmatively show that the purchase was advantageous to the beneficiary, and further affirmatively show he was not guilty of fraud, concealment, undue influence, and. that no unconscientious advantage was taken by him.

In view of all these facts and circumstances in the case, such as the appointment of the administrator, his qualification and entry upon the discharge of his trust duties, and the further fact that the corporation was later formed, of which Macfadden became president, which corporation purchased an interest in the partnership lands which were sold by the administrator, and that the corporation also purchased Ellsworth's interest in the partnership in the name of the corporation, it must be held that all such purchases were purchases by the administrator, and that any advantage gained or profit made by the corporation by reason of such purchases accrued not to the corporation, but to the *cestui que trust,* or the legal representatives of the deceased.

The purchase by the corporation of Ellsworth's interest in the partnership and the partnership property included also the purchase of the claim for $10,000 and interest against the deceased. Whatever ultimate profit or gain there was in such purchase, including the $10,000 claim and interest by reason of the trust relations of Macfadden, would inure to the *cestui que trust* or representative of the deceased; and it is held that such purchase by the corporation under the circumstances of this case was for the benefit of the estate of the deceased. This is another reason why the $10,000 claim could not be properly filed against the estate.

Considering at this time the question of fraud, we find that the trial court in its 20th finding of fact uses the following language: "Because of the wrongful and fraudulent conversion of the partnership property by the administrator through the corporation, Ellsworth-Jenkins Company, I charge the administrator with the cash value of the real estate at the date of conversion, January 1, 1909, and the value of the personal property, which I fix as follows, together with interest at the rate of 6 per cent per annum, on the same."

Finding No. 8 of the court's findings of fact is as follows: "On or about January 1, 1909, as the result of negotiations conducted by Mr.

Simonitsch and Mr. Macfadden on behalf of the corporation, Ellsworth-Jenkins Company, with J. H. Ellsworth, through which they hoped to make a personal profit, the latter, said Ellsworth, sold, transferred, and assigned to that corporation all his, said Ellsworth's rights and interest in the Ellsworth & Jenkins partnership property; and the corporation assumed all of said Ellsworth's obligations as a surviving partner. The corporation paid to said Ellsworth for said assignment the sum of $4,000; and thereafter Mr. Macfadden considered said corporation as the lawful assignee of said Ellsworth's rights as a surviving partner in said firm, and dealt with it accordingly. Mr. Macfadden, acting on the advice of counsel, believed that said transaction was proper and lawful, and that the corporation thereby acquired and succeeded to all the rights of J. H. Ellsworth as a surviving partner. The court, however, further finds that in total disregard of the rights of Mrs. Jenkins and the interest which she in fact represented as a stockholder in said Ellsworth-Jenkins Corporation, the said Macfadden, together with said Simonitsch, knowingly, willingly, and fraudulently sought to deprive her and said estate of all interest in said corporation, and the property thus secured from said estate, by canceling her stock in said corporation. All of which the court holds was in the nature of, and is evidence of, a conversion of the property of said estate by said Macfadden as of the date of the sale to the corporation of the Ellsworth interest; to wit, January 1, 1909.

"The court further holds that said transaction was unlawful because the decedent's estate being interested in the partnership estate, which was the subject of said transaction, and Mr. Macfadden being a stockholder and officer in the corporation to whom the assignment was made, the transaction necessarily placed him in a situation where his personal interests were or might be in conflict with his duty as administrator.

"The court therefore holds that as a matter of law the transaction must be treated and dealt with, not as a purchase by and assignment to the corporation, but as a conversion by Mr. Macfadden of the property of which he was a trustee, through the medium of the corporation."

The effect of these findings of fact by the court is to hold that Macfadden converted the property sold to the corporation to his own use in a fraudulent manner; that such fraud is further shown by the forcing of Mrs. Jenkins out of the corporation and canceling her stock. We

are of the opinion that the finding of the trial court is supported by the testimony. It would seem that the administrator being first appointed and having entered upon the discharge of his duties, and his position being one strictly of trust, and after having entered upon the performance of his trust as administrator, having formed the corporation of which he became president, which took over the business of the decedent, and which purchased through the administrator the property hereinbefore referred to, and having represented to Mrs. Jenkins the objects for which the corporation was formed, and thereafter the corporation having forced her out of the corporation, that it must be held the corporation was not conceived in good faith, but only as a medium through which the administrator could act and operate and secure undue advantage and profits to himself and those who were permitted to continue to share with him. This would in effect be a fraud against the interest of the *cestui que trust,* or the representatives of the deceased.

The $1,500 notes given by Macfadden and Simonitsch, whether given at the time the corporation was formed or just before they forced Mrs. Jenkins out of the corporation, do not place Macfadden in a more favorable position, nor is the giving of such notes any proof that Macfadden acted in good faith. At whatever time such notes were given they were immediately charged off to profit and loss. As we already in effect have held, the shares of stock of the corporation first issued to Macfadden and Simonitsch were issued to them for the good will of the Ellsworth & Jenkins business, Mrs. Jenkins also at the same time receiving fifteen shares. The stock issued to Macfadden and Simonitsch was never paid for otherwise than out of the profits of the corporation. Mrs. Jenkins was forced out of the corporation on the ground that she did not pay for her stock. It further appears that Simonitsch in 1908 paid into the corporation $1,000, receiving therefor ten shares of stock, but very shortly thereafter borrowed from the corporation $900. Later Macfadden received $1,500 worth of stock for his interest in the Soberg farm, the estate receiving $750 credit for the same interest. Macfadden later on paid $2,500 in cash and a half interest in another certain piece of land.

The correspondence between Macfadden and Ellsworth shows the activity of Macfadden in and about purchasing Ellsworth's interest in such partnership, including the $10,000 claim and interest of Ellsworth against Jenkins. Macfadden, after his appointment as adminis-

trator, hastened to collect the life insurance, which the record shows he did collect and which Jenkins carried, and out of the $10,000 policy made payable to the partnership he hastened to pay a $5,000 note which Ellsworth held against Jenkins, and in addition a claim of $1,600, all of which were exclusive of the additional amount claimed to be due from Jenkins to Ellsworth in the sum of $10,000.

After these transactions, Macfadden proceeded to purchase the interest of Ellsworth in the partnership, including the $10,000 claim,—all of which was purchased on behalf of the corporation, and the $10,000 claim and interest was thereafter filed against the estate of Jenkins. It is unnecessary to go into detail and set out the correspondence between Macfadden and Ellsworth leading up to the purchase of Ellsworth's interest in the partnership. It would seem from the correspondence and from all of Macfadden's acts with reference to his haste in being appointed administrator, the collection of the insurance and the forcing of Mrs. Jenkins out of the corporation, and many other circumstances and facts in the case, that Macfadden was acting in bad faith and was violating his every trust as administrator. Macfadden's actions are not placed in a more favorable light because he acted through a corporation. There is no doubt of the general rule of authority that a corporation is a legal entity, and will be considered as such until there is sufficient cause to consider it otherwise. Corporations, however, cannot be used as a cover under which wrongs may be committed and fraud perpetrated. If corporations are sought to be used as a cover for fraud and wrong, the court will look through the form of the corporation to ascertain its actual purpose and intent. Cook on Corporations, § 664, contains the following: "The disabilities of the corporation are not disabilities of the stockholders, nor are the disabilities of the stockholders the disabilities of the corporation. Hence it is that a corporation is often organized as a 'cloak' for frauds. Such cases as these are becoming common, and the courts are becoming more and more inclined to ignore the corporate existence when necessary in order to circumvent the fraud." No corporation can become so securely organized and protected as a legal entity as to become a cover for wrong and fraud, and thereby defeat the rights of innocent parties. A corporation cannot be greater than law and equity, nor by reason of its legal entity be immune from answering for fraud and wrong. In such case the protecting hands of

equity will brush aside the outward forms of the corporate entity, and analyze the foundation purpose and intent of the corporation; and if the purpose and intent of the corporation are not embedded in good faith, and are but a cover for wrong and fraud against the innocent, the corporate entity will afford no protection for such wrong and fraud in a court of equity.

Corporations in the transaction of business have a legitimate use as a matter of convenience, and when so used for the accomplishment of a legitimate purpose are not looked upon with disfavor either by courts of law or equity; and the legal entity of such corporations when engaged in a legitimate enterprise is recognized both at law and in equity; but neither law nor equity will ever recognize the right of a corporate entity to become the receptacle or cover for fraud or wrong based upon deception for the purpose of defeating the right of innocent parties.

The appellant has asked to be stricken from the account as stated by the learned trial court the following items: The good will item of $6,457.50. The appellant also asks that there be stricken from the account all the receipt items shown in the trial court's finding No. 23, which items immediately follow the good will item and include all the items to the end of the receipts, such items being so voluminous, and not enumerated herein. The appellant further asks that, in addition to the above items being stricken from the account, all other partnership items should be stricken therefrom. We are of the opinion that such items were properly included and should remain as stated by the trial court. The court made a proper allowance of the Wheeler and Derner claims, allowing them for the actual amount which the administrator paid in making settlement of them, such claims being settled at a discount by the administrator, who sought to include the full amount of such claims in his account. The administrator may not purchase claims against the estate at discount and receive credit in his account of his administration for the full amount of the claim, thereby securing a profit to himself. The court was also right in disallowing the $160 item paid by the administrator to Ellsworth-Jenkins Company as commission for selling the Lee farm, upon the same principle just stated with reference to purchasing claims against the estate. The payment of a commission by the administrator to the Ellsworth-Jenkins Company was in effect a payment of a commission to himself; for, being a member of the

corporation and president thereof, he must have received a part of the profits.

The appellant complains that he is charged with property, money, and effects between the time of the death of Jenkins and the time when the corporation, according to the claim of the appellant, actually commenced business, which was about the 1st of the year 1909.

It must be borne in mind, however, that this accounting is against W. C. Macfadden as administrator of the estate of H. H. Jenkins. Whatever property, money, or effects had or owned by Jenkins at the time of his death which came under the control of Macfadden must be accounted for. It is not shown that Mrs. Jenkins had anything to do with handling the money or property either before or after the appointment of the administrator; nor is it shown that any other person came into possession of any of the property, money, or effects of H. H. Jenkins after the time of his death, excepting W. C. Macfadden. W. C. Macfadden was appointed administrator on the 2d day of September, 1908. The corporation was organized and doing business, or about ready to do business, on October 3, 1908. All of the property of the H. H. Jenkins estate, whether of his personal estate or of the partnership, came into the possession and control of W. C. Macfadden, considerable of which, as we have seen, was sold by him to the corporation, of which he was president. It seems, therefore, that it is proper that he should account for all the property, money, or effects H. H. Jenkins possessed, or had an interest in, at the time of his death, whether it be his individual property or his interest in the partnership property. Appellant seeks to show that, if he is to be charged with the property, money, or effects of H. H. Jenkins, deceased, and during the time before the corporation was organized, and down to December 31, 1908, that then certain disbursements aggregating $11,363.39 should be allowed, Macfadden, the appellant, claiming that such disbursements had not been allowed; but in this we think the appellant is mistaken. One of the main disbursements which appellant claims should be allowed is a note of $5,000 to J. E. Ellsworth, and interest thereon aggregating $1,480, in all $6,480. Another of the disbursements is a note for $1,500 to the Equitable Insurance Company. Another is a note for $500 to the Fargo National Bank. At first glance his claim would appear plausible, but upon further examination it is found that the court, instead of charging the ap-

pellant's account with the $10,000 insurance payable to Ellsworth & Jenkins, charged only $1,538.11. This is the amount of that insurance policy remaining after the payment of such claims. If the disbursements were to be allowed in the manner contended for by the appellant, then the court would have charged his account also with $10,000 on account of the insurance payable to the partnership, instead of the balance which was left after paying the above claims, which was $1,-538.11. Two of the important items in the disbursements which are claimed should be allowed is one of $900 and one of $808.10, which are amounts the appellant claims he paid out on the Bowers farm to pay up a $1,600 mortgage. At the time the Bowers farm was sold the petition for the sale thereof showed there were two mortgages against it, one for $2,500 and one for $1,600. As a matter of fact there was only the $2,500 against the farm at the time of its sale through the probate court. The farm sold through the probate court for $1,500. It is apparent that said farm was sold with the idea that there was a $2,500 mortgage and a $1,600 then in force and effect, and the farm must have been sold subject to these two mortgages. It appears, therefore, that no credit is due the appellant for the $900 and $808.10 items.

The other items of disbursement which the appellant claimed should be allowed are several small items the appellant claims to have expended in regard to the Daley farm, Ripan farm, Bowers farm, Loomis farm, Van Vleet farm, Emerson farm, and the Henning property, together with certain amounts claimed to have been paid out for interest on mortgages against the Bowers, Ripan, Loomis, and Van Vleet farms. We are of the opinion that the court must have considered all these matters at the time of its findings of fact and the statement of account which it has set forth in its findings of fact. We notice, also, that in the statement of account of the receipts where charges of the various sums of money were made against the appellant, there appears to be no charges for any crops that might have been grown on the four farms above mentioned. If there were any crops for the year 1908 on such farms, they do not appear to be charged to the appellant. If there were crops upon such farms, and the appellant used the proceeds of such crops to pay the interest, then he has already been reimbursed.

The court below held in effect that all orders made by the probate court, and not appealed from within thirty days, became binding, and

were to remain effective, and were not to be disturbed unless by direct action. It also would not receive any testimony as to the value of the land sold by the administrator through the probate court to the corporation; and the price of the equities of the land so sold to the corporation would be the measure of damages in this particular accounting. Whatever the whole price of the equity of any piece of the partnership land or other land belonging to the decedent at the time of his death, or in which he had an interest which was sold by the administrator through the probate court to the corporation, would be the true measure of damages and the value of such equity to be charged to the account of the administrator in this action. In other words, the court held that in this proceeding no other value could be shown of the lands so sold by the administrator through the probate court except the cash value as determined by the sale of such land through the probate court; and no appeal having been taken from the orders confirming the sales, such orders became binding upon the district court so long as such orders remained in force, even though such orders were voidable orders and sales. This we believe to be the proper rule. We notice, however, the court in fixing the value of the equity of the land so sold increased the price of the land in the court's final account. That is, the court allowed a greater value for the equity in a given piece of land in making up the account which the court did make on the same piece of land, than the value of the equity of the same piece of land appears to have been as determined by the price for which such equity in such tract of land was sold in the probate court. For instance, the equity in the southeast quarter of section 27, township 140, range 50, was sold by the administrator through the probate court for $1,500, but the court in its account charged the account of Macfadden for the same piece of land $2,100, with interest on $2,100 from January 1, 1909, to February 1, 1916. This we believe to be an incorrect charge under the rule which governs in this case. As we view the matter, for the piece of land just described the court should have charged Macfadden's account $1,500, together with 6 per cent interest thereon from the date of the sale of such land through the probate court; and so it appears to be with other tracts of land, the equities of which were sold through the probate court by the administrator to the corporation. Wherever the administrator is charged with the value of an equity in a tract of land which was sold by him through the probate

court to the corporation, he should be charged the full value of such equity as determined by the price received for the same in the sale through the probate court, with interest on the price paid for such equity in the probate court at the rate of 6 per cent. And wherever the lower court has affixed a greater value to the equity of any given tract of land sold by the administrator through the probate court to the corporation than the price for which such equity of such tract of land sold in the sale through the probate court, the administrator's account is entitled to a credit of the difference between what the land sold for through the probate court and the amount with which the court charged the administrator for the equity in such piece of land in the account stated by the court. In other words, taking the southeast quarter of section 27, township 140, range 50 as an example, interest should be figured on $1,500, the price in the probate court, from the date of the sale to February 1, 1916, and that amount should be deducted from $2,992.50. The difference thus found should be credited to Macfadden's account as such account was stated by the lower court. Of course the estate will be entitled to receive interest until the time when the amount found to be owing from Macfadden to the estate is paid. Whatever difference the calculation in accordance with this requirement makes in regard to the manner and method of determining Macfadden's liability, which we have outlined, should be deducted from the whole amount found to be owing by him by the trial court, which was $26,217.65. This would not prevent, as we view the matter, under the theory under which this case has been tried, the exercise of any right of action which the respondent might have of a separate action to recover the balance of the value of the equities, if any, of the lands sold through the probate court by the administrator.

The court below held that there could be charged to the appellant only the cash selling price of the land at the time they were sold, and the sale of the farms was made only of the equity that remained in them at the time of the sale. The court held that no other value could be shown of such farms in these proceedings except the cash value as determined by the sale of such land through the probate court, the orders of which sales and the consummation thereof, not having been appealed from, were binding upon the district court so long as such orders remained in force, and even though they were voidable orders and sales. We are of the

opinion that the trial court took into consideration all the items of disbursement which the appellant claimed he should be allowed from the time of the death of Jenkins until the 31st of December.

We see no reason for disputing the findings of fact of the trial court, nor its account as stated in its findings of fact, except as we have indicated and set forth.

We might also further add that under the circumstances of this case the court might very well have disallowed any administrator's fees to the appellant, he not having performed his trust as administrator in the manner required by law.

A further fact to be taken into consideration is that Mrs. Jenkins has been put to great expense in litigation extending over a period of several years. Her mind has been in suspense, not knowing whether she would ever come into possession of that part of the proceeds of her husband's estate to which she was rightfully and lawfully entitled; and she having been denied for all these years the benefits of the use of the proceeds of her husband's estate by reason of the unfaithfulness of the administrator to his trust in not looking after all the property of the estate of the deceased with care and faithfulness, as he is required to do in obedience to the laws of this state. Courts cannot, or at least should not, look with favor upon the acts of one who occupies a trust relation and who by such acts in any manner fails to fairly, fully, and conscientiously execute his trust duties. Courts will scrutinize carefully the acts of persons in trust relations. Administrators are appointed by the courts which have jurisdiction over them, for the reason that such courts at the time of such appointment have confidence and implicit faith in the good faith, integrity, honest intention, and unquestionable character and ability of the one appointed as such administrator to fully execute the duties of what may be termed his sacred trust.

Where a man after many years of ceaseless struggle and toil has acquired some competence, some little property interest, or money, which is being accumulated for the protection and support of those dependent upon him, and for their use and benefit when the accumulator can no longer struggle for their support by reason of being called upon to answer the summons of the dread messenger of death, he has every reason to expect that in pursuance to the laws of the state such property, money, or effects will be safeguarded for the benefit of his dependents in order

that they may not become charges of the state, and in order that they may continue to maintain the same respectable place in society which they occupied during the lifetime of the decedent. Courts are exceedingly jealous, therefore, in the enforcement of such trust relations, and in holding those who assume those trust relations such as exist in this case, to strict accountability, to the end that the decedent's property held in trust by the administrator may pass to those representatives entitled to receive the same.

Any balance in Macfadden's favor in the ancillary administration in Minnesota may be offset against the amount which Macfadden is owing the estate in the principal administration in North Dakota, and also the amount of any credits he may be entitled to by what we have heretofore said with reference to the price or value of any equity as determined by the sale in the probate court. These deductions, if any, should be made from the amount of $26,217.65, the amount found owing by the trial court in its account stated.

The order and decision appealed from are affirmed, with costs.

BRUCE, Ch. J., and ROBINSON and BIRDZELL, JJ., concur in result.

CHRISTIANSON, J. (dissenting). I am unable to agree with the conclusions reached by my associates on many of the questions presented on this appeal, and will endeavor to discuss briefly the propositions on which I differ.

I desire to say at the outset that I fully concur in the sentiments expressed in the opinion prepared by Mr. Justice Grace, with respect to the obligations of an administrator or executor. I fully agree that every safeguard should be thrown around the administration of estates, and that an administrator or executor should not be permitted in any manner to enrich himself at the expense of the estate. And it is with this principle in mind that I have considered and arrived at my conclusions in this case.

This litigation arose in the county court. Macfadden was appointed administrator of the Jenkins estate in September, 1908, and continued to act as administrator until in October, 1910. At that time Macfadden tendered his resignation as administrator and filed his final account. A supplementary account was filed in July, 1914. Exceptions were filed

to the accounts and a full hearing had before the county court, with the result that the county court in January, 1915, made an order settling the account. An appeal was taken from the order, and on a hearing in the district court many of the findings made by the county judge were over-turned. The principal questions presented on this appeal are whether the county judge or the district judge was correct in their respective conclusions upon the facts and the law. The county court of Cass county has increased jurisdiction, and the presiding judge is a man of ripe experience. He has been an incumbent of his office for a long term of years, and was probably as well qualified to pass on the credibility of the witnesses and the other questions arising in consideration of the account as was the district judge. Not only did the county judge have the same opportunity to observe witnesses and parties, but he was familiar with the various details of the administration of the estate. Consequently I don't believe that in this case the findings of the trial court insofar as they overturn those of the county court are entitled to any particular weight.

The evidence shows that at the time Jenkins died he was in dire financial straits. The land business conducted by him in Fargo had for some months prior thereto concededly been a losing venture, and the books show a considerable loss. The only property left by Jenkins, aside from certain life insurance policies, consisted of equities in lands. The lands were all covered by one or more mortgages. At the time of his death and for sometime prior thereto, Jenkins had in his employ as book-keeper and assistant manager one Simonitsch. It was suggested that the land business started by Jenkins might be carried on with some profit, and that a corporation might be formed to carry on land business, and also that this corporation could aid the administrators in handling the equities in the lands to good advantage. The corporation was organized in September, 1908, and commenced business in October, 1908. The three incorporators were Macfadden, Simonitsch, and Mrs. Jenkins. Macfadden was cashier of one of the principal banks of Fargo. Simonitsch had had considerable experience in the land business and was particularly familiar with the affairs of Jenkins. No money was paid in by any of the incorporators, but they made an entry upon the books of the corporation listing as an asset "good will" in the sum of $4,500, and issued stock in the amount of $1,500 to each of the three incorporators.

The trial court held that the administrator in this manner permitted the good will of Jenkins's land business to be converted, and that the entry on the corporate books of $4,500, for "good will" was an admission that the business had this value. There was no other evidence whatever tending to show the particular value of the business except such entry.

If any evidentiary value is to be attached to the entry in the books, this, when taken in connection with the amount of stock actually issued to each of the three incorporators, could not be deemed to establish any valuation upon Jenkins's business, in excess of the amount of the stock actually issued to Mrs. Jenkins. As already stated Jenkins's land business had been, for some months prior to his death, operated at a considerable loss. Manifestly the business was of such a character that it could not very well be continued by the administrator. The good will contributed by Macfadden and Simonitsch was probably as great as any contributed by the Jenkins's estate. In fact Simonitsch was probably its chief asset, if he had stepped out there was little or nothing left.

The evidence shows that the Ellsworth-Jenkins Corporation became an actual going concern. It extended its operations and achieved a degree of success greatly in excess of the business formerly carried on by Jenkins. The business manager and directing spirit in the corporation was Simonitsch. Macfadden had little or no hand in its actual management or control. While the corporation aided in making rentals and otherwise looking after some of the lands belonging to the estate, only a very small, in fact an insignificant, portion of its business had anything to do with the affairs of Jenkins.

In my opinion the evidence clearly shows that the corporation was formed for a lawful purpose; that there was no intent on the part of Macfadden to utilize the corporation as a sham through which transactions with the estate might be carried on for his benefit; that the various transactions had by the corporation were for its own benefit, and not for the benefit of Macfadden, except as he might benefit the same as any other stockholder therein. The purchase by the corporation of the interest of Ellsworth in the partnership property was one which was directly in the line of business in which the corporation was engaged. Manifestly Macfadden could not, if he had desired to do so, have purchased Ellsworth's interest in the partnership property with the funds of the estate. The deal was one which the corporation itself might prop-

erly make and one which Macfadden as one of the stockholders could not possibly have prevented it from making. There is no contention on the part of anyone that the estate has in any manner suffered any detriment or injury because the Ellsworth-Jenkins Company purchased such interest. On the contrary it is quite clear to me that the sale resulted in considerable benefit to the estate. The Ellsworth-Jenkins Company succeeded in making sales of, and realizing moneys from, various equities of no particular value. By all such sales the estate was directly benefited. In what manner could the estate possibly be injured by the fact that this corporation acquired Ellsworth's interest? Ellsworth, the former owner, was an old man living in Iowa, and he apparently took little or no interest in a disposition of the property belonging to the partnership. The corporation instituted an active campaign to dispose of those equities, and converted paper equities into real money. The estate received an actual benefit therefrom.

While it is true that the supposed interest of the estate in these lands was sold to the corporation, it is also true that the corporation treated the sale by the administrator to it as a mere nominal transfer. Macfadden testified that the sale was made to the corporation, in order to have the title vested in the corporation, so that the equities could be conveniently handled and conveyed when a purchaser was found. The sales to the corporation were treated as nominal, and the administrator has accounted for the full share to which the estate would have been entitled if Ellsworth had made the sales as surviving partner.

.The subsequent trouble between Macfadden and Mrs. Jenkins, and the cancelation of her stock in the Ellsworth-Jenkins Company, has no particular bearing upon the liability of Macfadden as administrator or the amount due on his final account, but it probably furnishes a reason for the bitterness manifested toward Macfadden in this matter.

It is interesting to note that the district court not only allowed Macfadden his fees as administrator, but further found as a fact that *"Mr. Macfadden throughout his administration handled the business thereof with care, skill, and good business judgment, with a view to the best interest of the estate as he understood it to be,* except as to the cancelation of Mrs. Jenkins's stock in the corporation, the conversion of the partnership property through the corporation, and the appropriation by himself and the corporation of the business of the deceased, Jen-

kins.  Other errors found in his accounts and rectified by this court were due to mistakes of law as to his rights, duties, and obligations, or inadvertent errors."

In my opinion the decision in this case results in a grave injustice to Macfadden.

PER CURIAM.  After the filing of the decision of this court in the above-entitled action and within proper time, each party applied for a rehearing.  A rehearing will not be necessary in order to finally dispose of this case.  The opinion handed down, however, we believe should be modified in one important particular.  The lower court, in ¶ 27 of its findings and decree, in effect, held that it was bound by the decree of the county court of Cass county as to all sales of real property made by Macfadden as administrator, and for this reason could not, in this proceeding, consider any question as to the validity of these sales or inadequacy in the sale price.  This court, in its former opinion, understood and believed that such findings referred to all the real property which belonged to Jenkins individually as well as the partnership real property.  In this we were mistaken, and it is clear that such finding referred only to the real property belonging to Jenkins individually, and did not refer to the property of the partnership.

The court refused to receive any testimony relative to the value of the real property and lands belonging to Jenkins personally of which sales were had through the probate court, and in this regard the court proceeded properly.  The lower court, however, did receive testimony as to the value of the partnership lands, and after hearing such testimony the court placed valuations upon the equities in such land, which values are set forth in the court's findings, with reference to the value of the partnership lands.  We do not feel disposed to disturb the value of the equities of the partnership land as ascertained by the lower court, and hold that the values of the partnership land and property as found by the trial court are sustained by the testimony, and that the appellant is entitled to no reduction because of any increase in value of the partnership property fixed by the trial court over and above the sale price of such lands as evidenced by the records of the county court of Cass county, this upon the theory that the purchase of the partnership property by Macfadden through the medium of the corporation,

in the manner fully set out in the original opinion, amounted to conversion of such property, by reason of which the respondent would be entitled to recover the actual cash value of all the partnership property so purchased, both real and personal.

The former and original opinion is modified to the extent that the values of the equities of the partnership property as fixed by the trial court shall be taken to be the actual cash value of the equities and such partnership property. The appellant, in his brief and additional brief filed in response to the court's request, claimed that, from the $26,217.65 which the trial court found to be the amount owing by Macfadden, there should be deducted $6,064.46, being all partnership items prior to 1909, and also the good will item of $6,457.50, and in addition to that, to deduct the partnership property items of $775.31 and the Emerson farm item $926.25, and $359.61 for alleged excess of interest.

We believe we analyzed most of such matters quite fully in the main opinion, and do not think it necessary to again analyze such matters to any great length. Nothing more need be said with reference to the good will item for $6,457.50. That item has been discussed at great length in the main opinion, and the proper conclusion arrived at with reference to the same.

The appellant claimed that $6,064.46 should be deducted for partnership items prior to 1909. We analyzed this proposition quite fully in the main opinion, and concluded that a deduction of said amount for partnership items prior to 1909 should not be allowed. In other words, we, in effect, held that the trial court had made findings as to these partnership items, and we sustain such findings. We may analyze the item composing the $6,064.46 made up from the partnership items prior to 1909, with the view of making it clear that such items were properly charged against Macfadden. The items which made up said sum were:

| | |
|---|---|
| Balance of insurance money and interest | $2,191.90 |
| One half of Knuth contract and interest | 1,066.75 |
| One half of Haworth mortgage and interest | 776.63 |
| Daily crop and interest | 111.90 |
| Buettell farm | 85.50 |
| Mallory farm | 8.55 |
| The thirteen items from October 3, 1908, to November 14, aggregating | 1,823.33 |

The insurance policy to the partnership was $10,000. The insurance company held a note for $1,500. This was deducted. There was also paid out of the said insurance $513.11 to the Fargo National Bank, which took up a note for $500, and interest. Out of said insurance was also paid a note of $5,000 to J. H. Ellsworth, and also interest on said note to the amount of $1,480. The balance left after these deductions was an asset of the partnership, and it was proper for the trial court, as it did, to require Macfadden to account for it, and that item, with interest thereon amounted to $2,190.90, which the court charged against the account of Macfadden, which was proper. The trial court also found that the $1,090 that was received on the Haworth mortgage was a partnership asset, and that only $545 had been accounted for. This $545, and interest thereon, was charged to Macfadden's account. The trial court also found that $1,500 had been paid over by J. H. Carleton, January 3, 1909, in part payment of J. H. Ellsworth's interest in the Knuth contract, and that said $1,500 was a partnership asset and only $750 had been accounted for. The trial court therefore charged Macfadden's account $750, with interest thereon from January 3, 1909. The trial court charged $111.90 on account Dailey farm for part of the crop and interest on the value of such share of crop and $60, with interest from January 1, 1909, for hay from the Buettell farm, and $8.55 for hay from the Mallory farm. These, together with the $1,823.33, the other thirteen items, as we understand the matter, are objected to for the reason that such items were received by the partnership prior to the time the corporation bought out Ellsworth. We think that such objection is not well founded, and that the trial court was right in charging such items to Macfadden. Macfadden qualified and became administrator of Jenkins's estate on or about the 5th day of September, 1908. He then became the administrator of the entire estate of Jenkins. Jenkins's estate did not consist alone of his own individual property, but also included his interest in all the partnership affairs and property. It was the duty of Macfadden to look after and preserve faithfully and as a trust the entire interest of the estate. If, while acting as such administrator, he was instrumental in forming a corporation of which he became the president, which bought up the interest of Ellsworth in the partnership, any profits arising from such purchase by Macfadden, either to him or to the corporation of which

he was the president such profits accrued not to such corporation or to Macfadden personally, but accrued to the benefit of the Jenkins's estate, as we have most fully shown in the main opinion; and it was perfectly proper then to require Macfadden to account for all the property which came into his hands from the time he became administrator of Jenkins's estate. This accounting is brought, not only to compel Macfadden to account for the partnership property, but for all property which came into his hands, either partnerships or that which belonged to the individual estate of Jenkins, and the interest which Jenkins had in the partnership property was an asset of his estate.

We think, therefore, that all items referred to which were charged against Macfadden which came into his hands in 1908, and it is not successfully disputed but what all such items did come into his hands, were properly charged to him by the trial court, and we think it is proper to sustain such findings of the trial court. The appellant claims, however, that if he should be charged for such items, there should be deducted certain disbursements a list of which appellant has set forth in his brief, aggregating $11,918.56. An examination of such disbursements discloses that the major portion of them were allowed by the trial court; as, for instance, the $1,500 payable for the Equitable Insurance Company note, $500 and interest to the Fargo National Bank, $6,480 principal and interest of the note to Ellsworth. All of these the appellant has received credit for. The credits for $900 and $800.10 for payments made by J. H. Carleton on the Bowers farm were completely disposed of in the main opinion, so that practically all the disbursements claimed by appellant either have been allowed, and such as were not we believe were properly disallowed. There remain several other items in said list, none of which is very large, and most of which payments are for interest or mortgage on some of the farms which belonged to the partnership and which farms were purchased by the corporation. The court evidently did not allow these interest charges to Macfadden as disbursements.

As near as we are able to determine, we believe the trial court, at the time it fixed its values upon the equity of the partnership property which was converted, did so, taking into consideration that there were certain mortgages and interest owing upon said property, and that the value fixed by the court was the net value of the equity exclusive of any

interest on mortgages. We think this must be likely the reason why the court disallowed the interest disbursement charges made by the appellant. Any other disbursement charges claimed by the appellant which were disallowed by the trial court, we believe were properly disallowed. The trial court had the respective parties before it and was in a better position than we to pass upon each item of the disbursements. It was also in better position to know with which items to charge the account of Macfadden as administrator. We think the items which the trial court charged against the account of Macfadden as administrator were properly chargeable to such account.

In the main opinion we referred to a $1,600 claim paid out of the insurance money. The amount deducted by the insurance company was $1,500. The main opinion is corrected in this regard, as we should have stated that it was $1,500 deducted by the insurance company instead of $1,600. We also stated in the main opinion the following:

"Later Macfadden received $1,500 worth of stock for his interest in the Solberg farm, the estate receiving $750 credit for the same interest."

We should have said that Macfadden received $1,500 stock for his interest in the Solberg and Estby farm. However, the result is the same.

It is true that Macfadden and Simonitsch each contributed certain capital to the corporation, but did not contribute such capital at the time of the inception or organization of the corporation, but some time later as is shown by the evidence in the case. The organization of the corporation was completed about October 23, 1908, and about that time or about the 24th of October, 1908, commenced business. Later, commencing possibly with November 1, 1908, various amounts were contributed to the capital of such corporation by Simonitsch and Macfadden, for which they received stock in such corporation, but none of the amounts paid in by either were paid in at the inception of the corporation; that is, at the time the organization of the corporation was completed.

We have gone into the matters connected with this case at great length. The main opinion was exceedingly long and quite exhaustive. We have reviewed at considerable length the matters presented on the petition for rehearing. We are fully satisfied that the findings of the

trial court should not be disturbed. Especially in cases where a long account is involved should the findings of the trial court receive much credit. Not only has this case received the most careful attention by the trial court, but also by this court. The main opinion shall stand as heretofore rendered except as the same is, in any manner, modified by this per curiam opinion.

The petition for rehearing both of the appellant and respondent is denied.

All concur except Mr. Justice CHRISTIANSON, who adheres to the views expressed in his dissenting opinion.